192 F.3d 41 (2nd Cir. 1999)
 KRETA SHIPPING, S.A., as owner of the M/V AMPHION, for Exoneration from or Limitation of Liability, Plaintiff-Appellant, v
PREUSSAG INTERNATIONAL STEEL CORP., VOEST-ALPINE STEEL CORP., VOEST-ALPINE STAHL LINZ GMBH, SUNBELT TRADING CO., INC., HIGH STRENGTH STEEL EAST INC., OBEROSTERREICHISCHE, MANNESMANN PIPE & STEEL CORP., COMBINED ATLANTIC CARRIERS GMBH, THYSSEN, INC., THYSSEN SPECIALITY STEELS, INC., THYSSEN STEEL GROUP, KRUPP HOESCH STEEL PRODUCTS, INC., TRADEARBED, INC., MAGELLAN INTERNATIONAL TRADING CORPORATION, CARGILL FERROUS INTERNATIONAL, FRANCOSTEEL CORP, ASCO METAL DIVISION, Asco Metal Division of FrancoSteel Corp, CREUSON MARREL INC., VALLOUREC INC., FABRIQUE DE FER DE CHARLEROI USA INC., A.Z.E. SUPPLY CO., NEDESTAAL B.V., SUJANI ENTERPRISES, INC., CHARLEROI
(USA), MID AMERICA OVERSEAS, BENTELER A.G., COMBINED ATLANTIC CARRIERS GMBH, also known as COMBAC, Claimants-Appellees,
 Docket No. 98-7899
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: February 17, 1999
Decided: September 13, 1999
 
 Appeal from an order of the United States District Court for the Southern District of New York (Wood, J.) sitting in admiralty, vacating a concursus injunction issued pursuant to the Limitation of Liability Act, 46 U.S.C. §185, and preserving the availability of the limitation fund established pursuant to that statute for satisfaction of the claims of Nordstern Allgemeine Versicherungs AG.
 Remanded with instructions to the district court to modify its order in accordance with this opinion.
 RICHARD V. SINGLETON, II, Healy & Baillie, New York, New York (Thomas H. Belknap, Jr., of counsel), for Plaintiff-Appellant.
 STANLEY McDERMOTT III, Piper & Marbury L.L.P., New York, New York (Machale A. Miller, Miller & Co., L.L.C., New Orleans, Louisiana, of counsel), for Claimants-Appellees.
 Before: KEARSE and SACK, Circuit Judges, and McAVOY, District Judge.*
 SACK, Circuit Judge:
 
 
 1
 On January 11, 1996, caught in a furious storm during a mid-winter crossing of the Atlantic, the crew of the vessel M/V AMPHION abandoned ship and her cargo of steel several hundred miles off the Canadian Maritime coast. The crew was rescued and salvors recovered the AMPHION and her cargo. Cargo consignees nonetheless filed lawsuits against the vessel's owner, Kreta Shipping, S.A. ("Kreta"), alleging that the steel had been damaged. Kreta responded by filing this limitation action pursuant to the Limitation of Liability Act, 46 U.S.C. §181 et seq., in the United States District Court for the Southern District of New York (Wood, J.). Pursuant to that statute, Kreta posted security adjusted from time to time to equal the amount of its maximum potential liability under the Limitation Act and obtained a concursus injunction prohibiting any claimant from prosecuting claims related to the voyage of the AMPHION against Kreta in any other forum.
 
 
 2
 After obtaining stipulations from all claimants establishing that the aggregate of their claims did not exceed the value of the limitation fund, Nordstern Allgemeine Versicherungs AG ("Nordstern"),[1] an insurer subrogated to the rights of several of the cargo claimants, moved the district court to lift the concursus injunction in order to permit the movant to pursue its claims against Kreta in a foreign forum while at the same time preserving its right to satisfy from the limitation fund any judgment it might obtain. The district court granted Nordstern's motion in both respects. See In re Complaint of Kreta Shipping, S.A., Nos. 96 Civ. 1137 (KMW), 96 Civ. 600 (KMW), 96 Civ. 703 (KMW), and 96 Civ. 7711 (KMW), 1998 WL 299873, (S.D.N.Y. June 5, 1998) ("In re Kreta Shipping"). Kreta appeals.
 
 
 3
 We remand the case to the district court with instructions that it modify its order in accordance with this opinion.
 
 BACKGROUND
 
 4
 Nineteen ninety-six was not a good year for the M/V AMPHION. In January, the vessel was en route from Belgium and Germany to the United States laden with a cargo of steel coils and plates when disaster struck in the form of a raging winter storm. The AMPHION was lashed with hurricane-force winds and thirteen- to fifteen-meter seas that eventually forced the crew to abandon her some 500 miles off the coast of Halifax. A Canadian Fisheries vessel rescued the crew, and salvors later recovered the ship. After the salvors brought her to Halifax, the ship was inspected, refitted, and returned to service, departing Halifax for ports along the east coast of the United States and then abroad. Less than four months later, the ill-starred vessel ran aground in India on July 3, and was declared a total loss.
 
 
 5
 After the AMPHION was abandoned in the January storm, several parties with interests in her steel cargo filed separate suits against Kreta in the United States District Court for the Southern District of New York and in the United States District Court for the Eastern District of Pennsylvania alleging that exposure to seawater during and after the storm had damaged the steel. Kreta responded by commencing an action pursuant to the Limitation of Liability Act, 46 U.S.C. § 181 et seq. (the "Limitation Act") in the United States District Court for the Southern District of New York.
 
 
 6
 The Limitation Act is a venerable statute. It was enacted in 1851 to promote the development of the American merchant marine and to put American shipowners on a footing equal to shipowners hailing from other commercial seafaring nations, particularly Great Britain.[2] See Lake Tankers Corp. v. Henn, 354 U.S. 147, 150 (1957); The Aquitania, 20 F.2d 457, 458 (2d Cir. 1927); GRANT GILMORE &AMP; CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY §10-2 n.5, at 819 (2d ed. 1975). The Limitation Act provides that a shipowner may, within six months of receiving written notice of a claim against it and upon posting an adequate security fund, petition a United States District Court for limitation of its potential liability to an amount equal to the value of the owner's interest in the vessel plus the value of the vessel's pending freight. See 46 U.S.C. §§183(a), 185. The district court, sitting in admiralty and therefore without a jury, then conducts a proceeding known as a concursus, in which the court determines "whether there was negligence; if there was negligence, whether it was without the privity and knowledge of the owner; and if limitation is granted, how the [potentially-insufficient security] should be distributed" among multiple claimants. In re Complaint of Dammers & Vanderheide & Scheepvaart Maats Christina B.V., 836 F.2d 750, 755 (2d Cir. 1988) ("In re Dammers")(citation and internal quotation marks omitted).
 
 
 7
 The nature of the security that the shipowner must post in order to be eligible for limitation of liability is specified by the Limitation Act:
 
 
 8
 the owner (a) shall deposit with the court, for the benefit of claimants, a sum equal to the amount or value of the interest of such owner in the vessel and freight, or approved security therefor, and in addition such sums, or approved security therefor, as the court may from time to time fix as necessary ..., or (b) at his option shall transfer, for the benefit of claimants, to a trustee ... his interest in the vessel and freight, together with such sums, or approved security therefor, as the court may from time to time fix as necessary . . . .[3]46 U.S.C. §185. These sums and interests constitute the limitation fund beyond which, under the Limitation Act, a shipowner may not be held liable. See 46 U.S.C. §183(a). In compliance with this procedure, Kreta deposited with the district court a limitation fund in the amount of $3,380,000, reflecting the estimated value of the AMPHION and her pending freight less the estimated costs of repair and of security to the salvors.
 
 
 9
 The Limitation Act provides also that once a shipowner establishes the requisite security, "all claims and proceedings against the owner with respect to the matter in question shall cease." 46 U.S.C. §185. Consistent with this mandate, Rule F(3) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure (the "Supplemental Rules") provides that "[o]n application of the plaintiff the court shall enjoin the further prosecution of any action or proceeding against the plaintiff or the plaintiff's property with respect to any claim subject to limitation in the action." In accordance with these provisions, the district court, upon Kreta's motion, issued a concursus injunction barring the prosecution outside the limitation action itself of any claims against Kreta or the AMPHION arising out of the January 1996 incident.
 
 
 10
 Confronted with the carrot of the limitation fund and the stick of the concursus injunction, various potential claimants began to file claims against Kreta in the limitation action. Although not yet having appeared in the limitation action, on February 20, 1996, Thyssen, Inc., Thyssen Specialty Steels, Inc., Thyssen Steel Group (collectively, "Thyssen"), and Krupp Hoesch Steel Products, Inc., ("Krupp Hoesch"), all U.S. corporations, made a motion by order to show cause for an order lifting the injunction or modifying it to permit them to pursue their claims in a foreign forum. The district court denied the motion, and both Thyssen and Krupp Hoesch proceeded to file claims against Kreta in the limitation action. In doing so, however, they claimed to be making a "special and restrictive appearance," maintaining that (1) they would prefer to proceed with their claims in Antwerp, Belgium; (2) inasmuch as concursus injunctions have no extraterritorial effect, it was not effective against them because their partially subrogated insurer, Nordstern, was both a foreign corporation and the real party in interest; and (3) they should not be required to file a claim in the limitation action.
 
 
 11
 Nordstern then initiated an action against Kreta in Sweden on August 12, 1996, attaching Kreta's hull insurance policy in the amount of $3,500,000. Kreta responded within the limitation action by moving the district court to hold Thyssen and Krupp Hoesch in contempt for violating the concursus injunction. The district court agreed with Kreta that insofar as Nordstern's interest against Kreta derived from its partial subrogation to Thyssen and Krupp Hoesch's rights, Nordstern too was subject to the concursus injunction despite Nordstern's not having directly appeared in the limitation action. The court nonetheless declined to hold Nordstern in contempt, instead ordering Nordstern to elect between (1) proceeding with its Swedish action and thereby limiting Thyssen and Krupp Hoesch's potential recovery in the limitation action to that percentage of their interest to which Nordstern was not yet subrogated and (2) ceasing the Swedish litigation and appearing and seeking recovery, along with Thyssen and Krupp Hoesch, in the limitation action instead. The court gave Nordstern one month to elect its forum but warned that a failure to answer would be construed as an election of the Swedish action. In the same order, the district court also directed Magistrate Judge Peck to conduct an appraisal of the AMPHION, its cargo, and the costs associated with the salvage.
 
 
 12
 Nordstern requested permission to await the outcome of the magistrate's appraisal before electing its forum. The district court did not respond to this request, and the deadline for election came and went without the district court taking action. The parties and the court apparently considered Nordstern's request sufficient to forestall the effects of the district court's forum-election order. Magistrate Judge Peck then concluded that the limitation fund should be increased to $4,534,038, plus interest, the district court adopted this conclusion, Kreta added the requisite amount to the limitation fund, and the litigation continued.
 
 
 13
 At about this time, having by now become fully subrogated to Thyssen and Krupp Hoesch's rights against Kreta, Nordstern instituted an action against Kreta in another foreign forum, this time a court in Antwerp, Belgium.[4] Nordstern's undisputed motivation for seeking to litigate its claims in Belgium was to avoid the impact of the package liability limitation of the Carriage of Goods by Sea Act, 46 U.S.C. §1304 ("COGSA"), which would have governed an action here, and to receive instead the benefits of the Hague-Visby Amendments to the Hague Rules of 1924 ("Hague-Visby"). Under COGSA, the recovery of a cargo claimant such as Nordstern against a shipowner is limited to $500 per cargo package irrespective of the actual value of each package. See46 U.S.C. §1304(5). Hague-Visby permits a substantially larger recovery.[5] Although the bills of lading at issue in this litigation specifically provide for the application of COGSA, the parties do not dispute that a Belgian court would decline to enforce COGSA's $500 per-package limitation in favor of the more generous Hague-Visby rule. Cf. Van Ommeren Bulk Shipping B.V. v. Cooper/T.Smith Stevedoring Co., Inc., 35 F. Supp. 2d 469, 474 (D. Md. 1999) (adopting this view of Belgian law based on the testimony of an expert witness).
 
 
 14
 On April 15, 1998, Nordstern moved the district court to lift the concursus injunction while preserving its access to the Kreta limitation fund. In support, Nordstern filed a stipulation executed on behalf of all the claimants against Kreta to the effect that the aggregate of their claims did not exceed Kreta's maximum liability under the Limitation Act. Some wrangling over the sufficiency of these stipulations ensued and, when the dust settled, the stipulated aggregated amount stood at $4,534,000, or the amount of the limitation fund less $38.
 
 
 15
 The district court granted Nordstern's motion in all respects. See In re Kreta Shipping, 1998 WL 299873. In vacating the injunction, the court relied principally upon Lake Tankers Corp. v. Henn, 354 U.S. 147 (1957), which the district court construed as holding that it is not necessary to maintain the concursus injunction where, by stipulation or otherwise, it is established that the limitation fund exceeds the aggregate of the claims against it. SeeIn re Kreta Shipping, 1998 WL 299873, at *4-5 (discussing Lake Tankers, 354 U.S. at 150-52). The district court expressly rejected a narrower reading of Lake Tankers that would permit lifting of the injunction only in the additional circumstance that the claimant seeks that relief in order to pursue a common-law remedy in state court. See id. at *5.
 
 
 16
 Turning to Nordstern's request to preserve its access to the limitation fund despite its desire to recover for loss outside the limitation action and the court and jurisdiction in which it was pending, the district court framed the question as "whether Kreta, having furnished full security as a substitute for the vessel . . . is entitled to get that security back, despite the fact that the vessel is a total, constructive loss, simply because any judgment Nordstern may obtain will most likely be in a European forum, as opposed to in this Court." Id. at *6. Asserting that Nordstern would have been able to secure its claims and pursue them in the forum of its choice if not for the fact that Kreta instituted the limitation action, the court concluded that "to force Nordstern either to litigate in this forum, with its law unfavorable to Nordstern's interest, or to litigate in Europe without security would allow Kreta to profit unnecessarily from the fact that (1) it initiated the limitation proceeding that was ultimately unnecessary, and (2) the AMPHION was lost." Id. Accordingly, the court not only granted Nordstern's motion to lift the concursus injunction but also "maintain[ed] the limitation fund as security against which [any] foreign judgments may be enforced." Id.
 
 
 17
 Kreta appeals both aspects of this ruling.
 
 DISCUSSION
 
 18
 We must determine first whether the district court erred in lifting the concursus injunction. If we conclude that it did not, then we must decide whether the district court erred by preserving nonetheless Nordstern's access to the limitation fund for purposes of satisfying any judgment it may obtain against Kreta in a foreign forum.
 
 
 19
 I. Whether the district court erred in lifting the concursus injunction
 
 
 20
 Our inquiry begins, as it must, with the statutory language of the Limitation Act. As noted, it provides simply that "[u]pon compliance with the requirements of this section [i.e., timely filing of the petition and posting of adequate security] all claims and proceedings against the owner with respect to the matter in question shall cease." 46 U.S.C. §185. This language, on its face, appears to admit of no exception to its prohibition of parallel litigation. The same may be said of supporting Rule F(3) of the Supplemental Rules, which provides that "[o]n application of the plaintiff the court shall enjoin the further prosecution of any action or proceeding against the plaintiff or the plaintiff's property with respect to any claim subject to limitation in the action." The power of a district court in a limitation action to lift a properly issued concursus injunction thus is not at all apparent from the language of Supplemental Rule F(3) or of §185. Indeed, the mandatory language used in both the rule and the statute suggests a lack of such power.
 
 
 21
 Despite what we might today call the "plain meaning" of the statute, however, there is a long-standing line of authority firmly establishing the existence of at least two circumstances not addressed by the statute or rule in which courts must lift the concursus injunction:
 
 
 22
 First, the court must dissolve the injunction against other legal proceedings where the value of the limitation fund exceeds the total value of all the claims asserted against the shipowner. Second, the injunction must be dissolved where only the one claim is asserted against the shipowner.
 
 
 23
 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW §15-5, at 310 (2d ed. 1994) (footnote omitted); see also In re Dammers, 836 F.2d at 754-55 (referring to the two exceptions but relying in part on the interaction of the Limitation Act with the "saving-to-suitors clause" of 28 U.S.C. §1333 which, as discussed below, is not implicated here). Kreta's appeal presents the question whether the district court properly determined that this case falls within the first of these categories.
 
 
 24
 The rule that a court must lift the concursus injunction where the aggregate of the claims against the shipowner does not exceed the shipowner's liability fund possesses a distinguished pedigree in the Second Circuit beginning with our 1927 decision in The Aquitania, 20 F.2d at 458;[6] see also Petition of Texas Co., 213 F.2d 479, 481-82 (2d Cir.), cert. denied, 348 U.S. 829 (1954); Petition of Moran Transp. Corp., 185 F.2d 386, 388-89 (2d Cir. 1950), cert. denied, 340 U.S. 953 (1951); Curtis Bay Towing Co. v. Tug Kevin Moran, Inc., 159 F.2d 273, 276 (2d Cir. 1947). The Aquitania and its progeny based this doctrine not on a textual analysis of the Limitation Act, but on an assessment of the congressional purpose underlying it. In Petition of Texas Co., Judge Frank explained for this Court:
 
 
 25
 We have several times announced the principles which we think must apply here: Absent an insufficient fund (1) the statutory privilege of limiting liability is not in the nature of a forum non conveniens doctrine, and (2) the statute gives a ship-owner, sued in several suits (even if in divers places) by divers persons, no advantage over other kinds of defendants in the same position. Concourse is to be granted "only when * * * necessary in order to distribute an inadequate fund." [Curtis Bay, 159 F.2d at 276.] The "purpose of limitation proceedings is not to prevent a multiplicity of suits but, in an equitable fashion, to provide a marshalling of assets -- the distribution pro rata of an inadequate fund among claimants, none of whom can be paid in full." [Moran Transp., 185 F.2d at 388-89.]
 
 
 26
 213 F.2d at 482.
 
 
 27
 In 1957, in Lake Tankers Corp. v. Henn, 354 U.S. 147, the validity of the Second Circuit's construction of the Limitation Act came before the Supreme Court. There, as here, the claims against a shipowner in a limitation proceeding were limited by stipulation to an aggregate amount less than the shipowner's liability fund. See id. at 152. After summarizing the provisions of the Limitation Act, the Court declared that "where the value of the vessel and the pending freight, the fund paid into the proceeding by the offending owner, exceeds the claims made against it, there is no necessity for the maintenance of the concourse." Id. The Supreme Court explained:
 
 
 28
 For us to expand the jurisdictional provisions of the Act to prevent respondent from now proceeding in her state case would transform the Act from a protective instrument to an offensive weapon by which the shipowner could deprive suitors of their common-law rights, even where the limitation fund is known to be more than adequate to satisfy all demands upon it. The shipowner's right to limit liability is not so boundless. The Act is not one of immunity from liability but of limitation of it and we read no other privilege for the shipowner into its language over and above that granting him limited liability.
 
 
 29
 Id. at 152-53.
 
 
 30
 We read Lake Tankers to hold broadly that where the aggregate value of the claims against the shipowner do not exceed the limitation fund, then the injunction should be lifted irrespective of whether the claimants wish to assert "common-law rights" in state courts or other rights elsewhere. When the Supreme Court opined that "where the value of the vessel and the pending freight... exceeds the claims made against it, there is no necessity for the maintenance of the concourse," id. at 152, it reached that conclusion without reference to where or how the claimants sought to pursue their claims outside the limitation proceeding. It said also that "[t]he Act is not one of immunity from liability but of limitation of it and we read no other privilege for the shipowner into its language over and above that granting him limited liability." Id. at 152-53. It did not suggest that the shipowner is nonetheless privileged to insist on being sued only in courts in the United States. We think that the Court meant what it said.
 
 
 31
 To be sure, in the passage from Lake Tankers set forth in the indented quotation above, the Supreme Court warned that permitting the concursus injunction to persist where unneeded to protect the limitation on the shipowner's liability "could deprive suitors of their common-law rights...." Id. at 152. And the Lake Tankers Court continued:
 
 
 32
 In fact, the Congress not only created the limitation procedure for the primary purpose of apportioning the limitation fund among the claimants where that fund was inadequate to pay the claims in full, but it reserved to such suitors their common-law remedies. 63 Stat. 101, 28 U.S.C. §1333 [the "saving-to-suitors clause"].[7] In view of this explicit mandate from the Congress the [claimant] must not be thwarted in her attempt to employ her common-law remedy in the state court where she may obtain trial by jury.
 
 
 33
 Id. at 153 (footnote added). Based largely upon this language and words of similar import in In re Dammers, 836 F.2d at 755 (characterizing the Lake Tankers exception as arising out of the conflict between the saving-to-suitors clause and the Limitation Act), Kreta urges that Lake Tankers applies exclusively to cases in which the conflict between the Limitation Act and the saving-to-suitors clause arises, and that in this case the conflict is not implicated because the right to bring suit abroad is not "sav[ed]-to-suitors" under 28 U.S.C. §1333.
 
 
 34
 In Lake Tankers, as in other typical Limitation Act situations, the claimant was seeking to vindicate her "common-law right[]" to bring suit in a state court free of the admiralty court's concursus injunction. The Court recognized that the saving-to-suitors clause provided support for freeing such claimants from an injunction requiring them to bring suit solely in the limitations court. But there is nothing in what the Court said from which we can conclude that the conflict between the Limitation Act and the saving-to-suitors clause is the sole foundation on which the rule requiring the concursus injunction to be lifted lies; that when the conflict is absent the necessity to vacate the injunction disappears. The Court's decision was based instead principally on the perception that once the shipowner's right of limitation was protected and there was no need to marshal assets to apportion an inadequate fund among many claimants, the concursus injunction no longer served a valid purpose. Once, for that reason, the injunction is vacated, it does not matter whether a claimant takes advantage of its freedom from the injunction by bringing suit in a state court pursuant to the saving-to-suitors clause, or a foreign court -- or elsewhere for that matter.
 
 
 35
 We do not read In re Dammers to the contrary. There, as in Lake Tankers, we were considering a typical case in which the claimants sought to have a concursus injunction against them lifted so that they could proceed in a common-law state action before a jury. In that context we, as had the Supreme Court in Lake Tankers, recognized that vacating the injunction would resolve the conflict between the Limitation Act, which permits a district court to require that all claims against a shipowner be brought in admiralty court, and the saving-to-suitors clause, which protects parties' rights to pursue non-admiralty claims in other forums. But we had no occasion there to decide nor did we hold that the principle that a concursus injunction should be vacated where aggregate claims are no more than the limitation fund does not apply where a claimant seeks to bring claims other than in a state court and the conflict between the saving-to-suitors clause and the Limitation Act therefore arguably does not arise.
 
 
 36
 Indeed, we are compelled to reach a contrary conclusion by Curtis Bay. There, the claimants sought relief from a concursus injunction not in order to pursue their common-law remedies in a state court by virtue of the saving-to-suitors clause but to assert admiralty causes of action in another federal court. SeeCurtis Bay, 159 F.2d at 276. Writing for the Court, Judge Learned Hand said that
 
 
 37
 It is true that an injunction does not deny to any claimant the right of a common-law remedy where the common law is competent to give it; for the claimants are suing in the admiralty anyway. However, every claimant has a legally protected interest in choosing his forum, even though the method of trial be not changed if he is moved elsewhere. The privilege of limiting liability is not part of any doctrine of forum non conveniens; a shipowner, sued in several places by several persons, has no advantage over other persons in the same position. If he would consolidate the several suits against him, he must fulfill those conditions which govern the consolidation of actions; if he would move them for trial elsewhere, he must fulfill those which govern the removal of causes.
 
 
 38
 Id. (footnote and internal quotation marks omitted). We cannot reconcile Kreta's argument that the concursus injunction need not be lifted except to permit claimants their common-law remedies in state court with Curtis Bay's requirement that the concursus injunction there be vacated in order to permit non common-law claims to be made in a federal forum.
 
 
 39
 We do not think, moreover, that permitting Nordstern to pursue its claims in a foreign forum at this stage somehow inequitably deprives Kreta of benefits to which it is entitled under the Limitation Act. The first consideration of the Limitation Act, that Kreta's right to limit its liability be preserved, remains secure, and the second, that the district court be able to distribute an inadequate limitation fund pro rata to claimants, is not implicated. True, Kreta may lose the benefit of having COGSA rather than Hague-Visby applied to Nordstern's claim and also the arguable benefit of concentrating its defense against all comers in a single forum, but the Limitation Act confers neither of these benefits. It "is not part of any doctrine of forum non conveniens," id., and grants no privilege to a shipowner to dictate the substantive law applicable to a claim except as an incident to the shipowner's right of limitation. See, e.g., Lake Tankers, 354 U.S. at 152-54; Petition of Texas Co., 213 F.2d at 482; The Aquitania, 20 F.2d at 458; cf. The Happy Fellow, [1997] 1 Lloyds Rep. 130, 135 (Q.B. 1996) (quoting Caltex Singapore Pte. v. BP Shipping Ltd., [1996] 1 Lloyd's Rep. 286, 293-94 (Q.B. 1995) ("The effect of the [Limitation of Liability] Convention... is not to qualify the substantive right of the claimant against the shipowner but to limit the extent to which that right can be enforced against the limitation fund."). We therefore agree with the district court's conclusion that it was empowered to lift the concursus injunction upon finding that Kreta's right of limitation is secure.[8]
 
 
 40
 An essential and integral part of the scheme that requires us to affirm the lifting of the concursus injunction is Kreta's fundamental right to its limitation under the Limitation Act. There remains the question, then, whether the district court correctly determined that Kreta's right of limitation is adequately protected. As a general rule, the signing of stipulations binding all claimants to limit the aggregate recovery they seek to no more than the value of the limitation fund will suffice to ensure a shipowner's limitation right. See, e.g., Lake Tankers, 354 U.S. at 149-50. But where, as here, the claimant is a foreign entity wishing to pursue its rights in a foreign forum, there is some question whether such a stipulation will prove wholly effective in practice. We perceive the risk, for example, that Nordstern may recover in a Belgian court an amount in excess of that to which it stipulated, and then seek to execute the resulting judgment fully upon the shipowner's assets in the foreign forum.
 
 
 41
 This concern may be ameliorated in the present case. Counsel for Nordstern represented at oral argument before us that his client "will stipulate that the claim in Antwerp will be exactly the same as the stipulated claim here." He further represented that "if we were to go to Antwerp and seek to assert a larger claim, I believe that we would be estopped by the stipulations from doing so, because we had stipulated our claims worldwide." Those stipulations and representations, if they are made binding upon Nordstern, would, it appears to us, protect the right of limitation to which Kreta is entitled. We therefore remand for the district court, through any combination of order, stipulation, retention of jurisdiction, or other powers at its disposal, to ensure that the terms and import of those stipulations and representations are binding on Nordstern.
 
 
 42
 II. Whether the district court erred by preserving Nordstern's access to the limitation fund
 
 
 43
 The last question before us is whether the district court erred by maintaining Nordstern's access to the limitation fund for purposes of satisfying any judgment it may obtain irrespective of whether the judgment is obtained in another forum. We think not.
 
 
 44
 Kreta contends that the court abused its discretion in preserving Nordstern's access to the limitation fund, arguing that Nordstern should not reap the benefit of access if not also willing to accept the burden of participating in the concursus. But this argument misstates the quid pro quo at work here. In exchange for posting adequate security, Kreta receives primarily the right to limit its liability. As discussed above, this right is facilitated by and in some cases necessitates a concursus injunction, but the injunction is not an end in itself under the Limitation Act.
 
 
 45
 Were the court to conclude otherwise, and decide that as a rule a claimant that succeeds in having the concursus injunction lifted may not satisfy a judgment obtained in a foreign forum against the limitation fund despite remaining restrained by the shipowner's right of limitation, the claimant's right to pursue its claims elsewhere would be rendered a nullity, at least where the shipowner lacked other assets upon which the claimant could execute. As we have held, Nordstern has a right to choose the forum for its claims so long as Kreta is assured that the aggregate amount of claims is no more than the amount in the limitation fund and other claimants are protected. Having recognized that right in one breath we are loath to eviscerate it in the next; i.e., to hold that while Nordstern has a right to sue elsewhere, the only way that it can assure its ability to recover on a judgment is to bring suit not elsewhere but in the Southern District of New York. Accordingly, we conclude that where a concursus injunction properly is lifted and the shipowner maintains a secured right of limitation, there is nothing automatically inequitable about preserving claimants' access to the limitation fund for satisfaction of judgments from other forums.
 
 
 46
 Kreta responds by pointing out as an additional equitable consideration that Nordstern has obtained security in the amount of $3.5 million in a foreign forum, despite the fact that under the stipulations discussed above it promised to seek a maximum recovery of a lesser amount. This state of affairs is, as Kreta argues, at odds with Nordstern's avowed intent to respect Kreta's right of limitation and Nordstern's assertion that it must have access to the limitation fund lest it be unable to collect a foreign judgment. At oral argument, however, Nordstern's counsel represented that should Nordstern's right to pursue its claims abroad while retaining the right to satisfy any judgment thus obtained from the limitation fund be upheld, Nordstern would release the foreign security in question. We therefore instruct the district court, upon remand, to modify its order preserving Nordstern's access to the limitation fund to require that Nordstern immediately relinquish all security held in foreign forums as a condition for continued access to the limitation fund.
 
 CONCLUSION
 
 47
 For the foregoing reasons, we affirm the order of the district court, but remand with instructions to modify that order in accordance with this opinion.
 
 
 48
 Each party shall bear its own costs.
 
 
 
 Notes:
 
 
 *
 The Honorable Thomas J. McAvoy, Chief Judge of the United States District Court for the Northern District of New York, sitting by designation.
 
 
 [1]
 Nordstern Allgemeine Versicherungs AG, an insurance company, appears never to have formally become a party in the district court action and is therefore not technically an appellee. It participated fully in the district court action through subrogees and was held by that court to have appeared in the action and to be subject to the concursus injunction which is the subject of this appeal. We therefore treat Nordstern as an appellee here.
 
 
 [2]
 Congress designed the Limitation Act "to induce the heavy financial commitments the shipping industry requires by mitigating the threat of a multitude of suits and the hazards of vast, unlimited liability as the result of a maritime disaster." Maryland Casualty Co. v. Cushing, 347 U.S. 409, 414 (1954).
 This American limitation statute is particularly beneficial to shipowners. Unlike under the English statute on which it was modeled, under the American statute, the fund against which the claimants must make their claim is equal to the value of the ship after the voyage on which the incident occurred. See Norwich Co. v. Wright, 80 U.S. 104, 120-22 (1871). "Thus if the ship is lost, the value is zero; if a few strippings from the wreck and a life boat or two are saved, those may be solemnly handed over to a trustee or their value ascertained and a bond posted." GRANT GILMORE &AMP; CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 10-29, at 907 (2d ed. 1975).
 Pickle v. Char Lee Seafood, Inc., 174 F.3d 444, 449 (4th Cir. 1999).
 
 
 [3]
 Security also must be provided for costs and for interest at a rate of six percent per annum. See Rule F(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.
 
 
 [4]
 It is unclear what became of the Swedish action.
 
 
 [5]
 The Hague Rules of 1924 were the result of an international effort to unify the rules of law governing bills of lading. The United States adopted the Hague Rules, but not the 1968 amendments known as Hague-Visby, which provide per-package limitations significantly higher than the $500 per-package limitation imposed by COGSA. See Nippon Fire & Marine Ins. Co. v. M.V. TOURCOING, 167 F.3d 99, 101-02 (2d Cir. 1999).
 
 
 [6]
 The roots of the holding in The Aquitania run back at least another forty years to the cases that held that where there is but a single claim that seeks less than the value of a vessel, no concursus injunction is warranted. See The Aquitania, 14 F.2d 456 (S.D.N.Y. 1926), aff'd, 20 F.2d 457, and cases cited therein.
 
 
 [7]
 Section 1333 provides, in relevant part, that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled . . . ." 28 U.S.C. § 1333.
 For purposes of this opinion, we accept Kreta's assumption, not shared by the claimants, that only common-law remedies are saved to suitors by this statute. It is not entirely clear, however, that this construction is correct and that the phrase "other remedies to which they are otherwise entitled" does not include non-common-law lawsuits instituted abroad such as that which Nordstern seeks to bring in Antwerp. We do not decide the issue, however, since the result in this case would in either event be the same.
 
 
 [8]
 The district court did not conclude that it must lift the concursus injunction but only that it may do so if it finds "further considerations" warrant. In re Kreta Shipping, 1998 WL 299873, at *5. "Further considerations" seem unnecessary in light of the holding of Curtis Bay, 159 F.2d at 276 ("The order must be reversed, so far as it let the injunction stand."). Since the district court's action was correct, however, we need not and do not decide whether vacating the injunction was mandatory.